# In the United States Court of Federal Claims

No. 18-136C
(Filed: October 11, 2018)

|  |  |
|---|---|
| SANFORD HEALTH PLAN,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Keywords: Affordable Care Act; Cost-Sharing Reductions; <u>Moda Health Plan</u>; <u>Montana Health</u>; Statutory Obligation; Appropriations; Budgetary Authority. |

*Stephen McBrady*, Crowell & Moring LLP, Washington, D.C., for Plaintiff. *Daniel Wolff*, *Xavier Baker*, *Skye Mathieson*, and *Monica Sterling*, Crowell & Moring LLP, Washington, D.C., Of Counsel.

*Christopher J. Carney*, Senior Litigation Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for Defendant, with whom were *Claudia Burke*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Chad A. Readler*, Acting Assistant Attorney General. *Eric E. Laufgraben*, *Veronica N. Onyema*, Trial Attorneys, U.S. Department of Justice, Of Counsel.

**OPINION AND ORDER**

**KAPLAN, Judge.**

This case arises out of a complaint filed by plaintiff Sanford Health Plan ("Sanford"), a health insurer that sells qualified health plans on health care exchanges established by the Patient Protection and Affordable Care Act (ACA), Pub. L. No. 111-148, 124 Stat. 119 (2010) (codified primarily in scattered sections of 42 U.S.C.). In its complaint Sanford alleges that it is owed some $1.6 million by the federal government, representing cost-sharing reduction payments it claims it was entitled to receive during 2017 under the cost-sharing reduction provision of the ACA, 42 U.S.C. § 18071.

Currently before the Court is the government's motion to dismiss Sanford's complaint and Sanford's cross-motion for summary judgment as to liability. The government argues that Sanford has failed to state a claim because Congress did not appropriate funds to make the cost-sharing reduction payments, which it says reflects that Congress never intended to create an enforceable obligation for such payments. Sanford, on the other hand, argues that the ACA created a mandatory obligation on the part of the government to make payments to insurers who implement cost-sharing reductions under the ACA, irrespective of Congress's failure to appropriate the funds necessary to do so.

For the reasons set forth below, the Court concludes that the government violated a statutory obligation created by Congress in the ACA when it failed to provide Sanford its full cost-sharing reduction payments for 2017, and that Congress's failure to appropriate funds to make those payments did not vitiate that obligation. Accordingly, the government's motion to dismiss is **DENIED** and Sanford's cross-motion for summary judgment is **GRANTED**.

## BACKGROUND

**I.      Statutory Framework**

In 2010, Congress passed and President Obama signed the ACA. As a result of the ACA, "health benefit exchanges" were established nationwide. The exchanges serve as "virtual marketplaces in each state wherein individuals and small groups [can] purchase health coverage." Moda Health Plan, Inc. v. United States, 892 F.3d 1311, 1314 (Fed. Cir. 2018); see also 42 U.S.C. § 18031(b)(1).

As pertinent to this case, the ACA implemented two reforms aimed at ensuring that plans offered on the exchanges would be affordable. The first is a premium tax credit, which was effected by amending the Internal Revenue Code to add a new provision. See ACA § 1401, 26 U.S.C. § 36B. It is a refundable tax credit that subsidizes health insurance premiums for taxpayers with household incomes that fall between 100 and 400 percent of federal poverty levels. 26 U.S.C. § 36B(c)(1)(A). The amount of the tax credit can be based on, among other things, the enrollee's income and the price of the second-lowest cost "silver" plan available on the enrollee's exchange. See id. § 36B(b)(2).[1] Under the ACA, the tax credit is estimated and paid in advance directly to the insurer, so that the enrollee's insurance premiums are reduced. See ACA § 1412(a), 42 U.S.C. § 18082(a); see also 26 U.S.C. § 36B(f).

The second relevant ACA reform is the cost-sharing reduction (CSR) requirement imposed on issuers of certain qualified health plans. ACA § 1402, 42 U.S.C. § 18071. Enrollees eligible for cost-sharing reductions under the ACA are those who enroll in qualified plans at the silver level and whose household income is between 100 and 400 percent of applicable federal poverty levels. 42 U.S.C. § 18071(b). Pursuant to the cost-sharing reduction requirement, insurers offering health plans on the exchanges must reduce these enrollees' out-of-pocket costs for "deductibles, coinsurance, copayments, or similar charges" by a specified amount. Id. § 18071(a)(2); id. § 18022(c)(3)(A).

As pertinent to this case, the ACA, in turn, provides a mechanism to compensate insurers for the cost of making these reductions. It states that insurers "shall notify the Secretary [of Health and Human Services] of such reductions" and that "the Secretary shall make periodic and timely payments to the issuer equal to the value of the reductions." Id. § 18071(c)(3)(A).

---

[1] Insurance plans offered on the exchanges are classified into four levels: platinum, gold, silver, and bronze. 42 U.S.C. § 18022(d)(1). The classifications are based on the percentage of an enrollee's health care costs that the issuer of the plan will pay. Id.

The Department of Health and Human Services has promulgated regulations to carry out the cost-sharing reduction provisions. They provide, in pertinent part, that the "issuer must ensure that an individual eligible for cost-sharing reductions . . . pays only the cost sharing required of an eligible individual for the applicable covered service." 45 C.F.R. § 156.410(a). In addition, "[t]he cost-sharing reduction for which an individual is eligible must be applied when the cost sharing is collected." Id. With respect to the compensation of insurers that provide CSRs, the regulations specify that such insurers "will receive periodic advance payments based on the advance payment amounts calculated in accordance" with a regulatory formula. Id. § 156.430(b)(1).[2]

## II.   The Genesis of the Current Dispute

Under the ACA, the state and federal insurance exchanges were to be established no later than January 1, 2014. See 42 U.S.C. § 18031(b)(1). In anticipation of that deadline, in its fiscal 2014 budget (submitted in April 2013), the Obama Administration proposed the appropriation of "such sums as necessary" for, among other things, "carrying out . . . section[] 1402" of the ACA. U.S. House of Representatives v. Burwell, 185 F. Supp. 3d 165, 172 (D.D.C. 2016) (Burwell II) (quoting App. to Fiscal Year 2014 Budget of the U.S. Gov't at 448).[3]

On July 11, 2013, the Senate Appropriations Committee adopted S. 1284, a bill appropriating money for HHS and other agencies for FY 2014. See S. Rep. No. 113-71, at 1 (2013). In a report accompanying the bill, the Committee stated that its recommendation "d[id] not include a mandatory appropriation, requested by the administration, for reduced cost sharing assistance . . . as provided for in sections 1402 and 1412 of the ACA." Id. at 123. No appropriation has since been enacted to cover the costs of CSR payments. See Burwell II, 185 F. Supp. 3d at 173–74.

Nonetheless, in January of 2014 (and continuing until October of 2017), HHS began making advance cost-sharing reduction payments to eligible insurers, funding them with money from the permanent appropriation for tax credit refunds in 31 U.S.C. § 1324. See id. at 174. According to arguments later made by the Obama Administration in litigation, this appropriation was "available to fund all components of the Act's integrated system of subsidies for the purchase of health insurance, including both the premium tax credit and cost-sharing portions of the advance payments required by the Act." Id. (quotation omitted).

Shortly thereafter, the U.S. House of Representatives brought suit in the U.S. District Court for the District of Columbia, complaining that HHS and the Department of Treasury had spent "billions of unappropriated dollars to support the Patient Protection and Affordable Care Act." U.S. House of Representatives v. Burwell, 130 F. Supp. 3d 53, 57 (D.D.C. 2015) (Burwell

---

[2] The regulations further provide that HHS will reconcile the amounts paid in advance and the actual cost-sharing reductions made. See 45 C.F.R. §§ 156.430(c), (d).

[3] The premium tax credits of § 1401 were not made subject to the annual appropriations process. Instead, the ACA added the tax credits to a preexisting permanent appropriation for tax refunds. ACA § 1401(d)(1); see also 31 U.S.C. § 1324(b)(2).

3

I). The House contended "that Section 1401 Premium Tax Credits are funded by a permanent appropriation in the Internal Revenue Code, whereas Section 1402 Cost–Sharing Offsets must be funded and re-funded by annual, current appropriations," and that "Congress has not, and never has, appropriated any funds (whether through temporary appropriations or permanent appropriations) to make any Section 1402 Offset Program payments to Insurers." Id. at 60. Therefore, the House argued, the use of funds appropriated for the premium tax credits to fund the cost-sharing reduction payments violated the Appropriations Clause of the U.S. Constitution (art. I, § 9, cl. 7). Id. at 69.

The district court agreed and issued an injunction against payment of the CSRs while there was no appropriation in place to fund them. Burwell II, 185 F. Supp. 3d at 189. The court, however, stayed the injunction pending appeal. Id. Subsequently, while the case was on appeal, members of the newly elected Trump Administration made public statements suggesting that it was reconsidering the Obama Administration's legal position and that it might withdraw the government's appeal. The House therefore sought and was granted a stay of the appeal by the D.C. Circuit. See U.S. House of Representatives v. Burwell, 676 F. App'x 1 (Mem.) (D.C. Cir. 2016) (Burwell III).

While that litigation was pending in the district court and the D.C. Circuit, HHS continued to make cost-sharing reduction payments to insurers using funds appropriated under 31 U.S.C. § 1324. On October 11, 2017, however, Attorney General Sessions sent a letter to the Secretary of Treasury and the acting Secretary of HHS, advising them that the Justice Department had concluded that § 1324 did not appropriate funds to make payments under the CSR program. Letter from Att'y Gen. Sessions to Sec'y Mnuchin & Acting Sec'y Wright (Oct. 11, 2017), https://www.hhs.gov/sites/default/files/csr-payment-memo.pdf; see also California v. Trump, 267 F. Supp. 3d 1119, 1125 (N.D. Cal. 2017). The next day, HHS's Acting Secretary issued a memorandum to the Centers for Medicare and Medicaid Services directing that, in light of the Attorney General's legal opinion "and the absence of any other appropriation that could be used to fund CSR payments—CSR payments to issuers must stop, effective immediately." Memo from Acting Sec'y Hargan to Adm'r Verma (Oct. 12, 2017), https://www.hhs.gov/sites/default/files/csr-payment-memo.pdf.

**III. The Present Lawsuit**

Shortly after HHS stopped making CSR payments, health insurance carriers—including the plaintiff in this case, Sanford—filed a series of lawsuits in the Court of Federal Claims. In these suits, the insurers seek monetary relief to compensate them for unpaid CSR payments to which they claim an entitlement under the ACA. See, e.g., Montana Health Co-op v. United States, No. 18-143C; Common Ground Healthcare Coop. v. United States, No. 17-877C; Maine Cmty. Health Options v. United States, No. 17-2057C.

Sanford, an issuer of qualified health plans that offers health insurance on the South Dakota, North Dakota, and Iowa exchanges, filed its complaint in the present case on January 26, 2018. Compl. ¶¶ 22–24, ECF No. 1. It alleges that, as required by the ACA, it provided cost-sharing reductions to eligible enrollees in its plans. See id. ¶ 47. It further alleges that notwithstanding the fact that it made these reductions, it did not receive any CSR payments for the last quarter of 2017 as a result of HHS's October 12, 2017 directive. Id. ¶¶ 40, 49. It requests

damages in the amount of $1,640,614 based on the government's alleged violation of Section 1402. Id. at 49.[4]

The government filed its motion to dismiss on May 29, 2018, arguing that Congress did not create "an unconditional entitlement to [CSR] payment[s]" and, therefore, CSR payments would only be made "to the extent appropriations are available." Mot. to Dismiss at 21, 23, ECF No. 8. On July 2, 2018, Sanford filed an opposition to the government's motion to dismiss and a cross-motion for summary judgment. See generally Pl.'s Cross-Mot. for Summ. J., Opp. to Def.'s Mot. to Dismiss, & Mem. of Law in Supp. ("Cross-Mot."), ECF No. 11.

In light of the Court's decision in Montana Health Co-op v. United States, No. 18-143C, 2018 WL 4203938 (Fed. Cl. Sept. 4, 2018), and pursuant to Rule 40.1(b) of the Rules of the Court of Federal Claims, the present case was transferred from Senior Judge Nancy B. Firestone to the undersigned on September 5, 2018. Order, Sept. 5, 2018, ECF No. 14.

The issues raised in the present case are identical to those raised in and decided in Montana Health. In addition, the parties are represented by the same counsel and have filed briefs that are almost identical to those filed in Montana Health. For those reasons, on September 6, 2018, the Court directed the parties to file a joint status report by October 4, 2018 providing guidance on how they wished to proceed. Order, Sept. 6, 2018, ECF No. 16.

The parties timely filed the requested status report, in which they informed the Court that oral argument was not necessary given the "substantially similar briefing, and [that] the attorneys are the same in both cases." Joint Status Report at 2, Oct. 4, 2018, ECF No. 17. The parties advised the Court that were it to adopt the ruling from Montana Health in the present case, "no further proceedings would be needed to determine the quantum due to Sanford Health." Id. They also stated that "[CMS] has reconciled the amounts it has paid to [QHP] issuers in advance CSR payments for benefit year 2017 against the amount of CSRs each respective issuer paid on behalf of its insureds for benefit year 2017." Id. Following this reconciliation, according to the joint status report, the amount the government would have owed Sanford is $360,254. Id.

## DISCUSSION

**I.      Jurisdiction**

Under the Tucker Act, the United States Court of Federal Claims has jurisdiction to "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2012). The Tucker Act serves as a waiver of sovereign

---

[4] Sanford also claims that the government's failure to reimburse its cost-sharing reductions was a breach of an implied-in-fact contract in which the government agreed to make the cost-sharing reduction payments in exchange for Sanford's agreement to offer its plans on the ACA's exchanges. Compl. ¶¶ 51, 59. The Court does not reach this claim in light of its favorable disposition of Sanford's statutory claim.

5

immunity and a jurisdictional grant, but it does not create a substantive cause of action. Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1306 (Fed. Cir. 2008). A plaintiff, therefore, must establish that "a separate source of substantive law . . . creates the right to money damages." Id. (quoting Fisher v. United States, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc in relevant part)).

"[A] statute is money-mandating for jurisdictional purposes if it 'can fairly be interpreted' to require payment of damages, or if it is 'reasonably amenable' to such a reading." Moda Health Plan, 892 F.3d at 1320 n.2 (quoting Greenlee Cty. v. United States, 487 F.3d 871, 877 (Fed. Cir. 2007)). In this case, § 1402 of the ACA states that insurers "shall notify the Secretary [of Health and Human Services] of [its cost-sharing] reductions and the Secretary shall make periodic and timely payments to the issuer equal to the value of the reductions." 42 U.S.C. § 18071(c)(3)(A) (emphasis supplied). The "use of the word 'shall' generally makes a statute money-mandating." Greenlee Cty., 487 F.3d at 877 (quoting Agwiak v. United States, 347 F.3d 1375, 1380 (Fed. Cir. 2003)). Further, HHS's implementing regulations similarly state that insurers "will receive periodic advance payments based on the advance payment amounts calculated in accordance" with the regulatory formula. 45 C.F.R. § 156.430(b)(1) (emphasis supplied).

These provisions supply money-mandating sources of law for purposes of establishing this Court's Tucker Act jurisdiction. See Moda Health Plan, 892 F.3d at 1320–21 & n.2 (holding that § 1342 of the ACA, 42 U.S.C. § 18062, which states that "[t]he Secretary shall establish and administer" a risk corridors program and that "the Secretary shall pay" an amount according to a statutory formula under that program, is money mandating). Accordingly, this Court has jurisdiction under the Tucker Act over Sanford's claim for monetary relief under § 1402 of the ACA.[5]

## II. Merits

The parties' cross-motions present a single, purely legal issue: whether the federal government had a statutory obligation to provide Sanford with the cost-sharing reduction payments described in § 1402 of the ACA, notwithstanding the lack of appropriations to fund such payments. Sanford contends that such an obligation was imposed by the plain language of § 1402. The government's central argument, on the other hand, is that Congress could not have intended to impose such an obligation because, while it made arrangements to fund the premium

---

[5] Although the government has not challenged this Court's jurisdiction over Sanford's claims, it suggests for the first time in its reply brief that those claims should be dismissed because § 1402 does not confer a cause of action for damages on plaintiffs where the failure to make CSR payments is based on a lack of appropriations. Def.'s Reply in Supp. of Its Mot. to Dismiss & Opp'n to Pl.'s Cross-Mot. for Summ. J. (Def.'s Reply) at 9, ECF No. 12. For the reasons set forth in Montana Health, this contention is inconsistent with this court's long-standing and well-established authority to entertain suits for money damages under the Tucker Act based on money-mandating statutes like the ACA. Montana Health, No. 18-143C, 2018 WL 4203938, at *4 (Fed. Cl. Sept. 4, 2018) (citing Moda Health Plan, 892 F.3d at 1320–21 & n.2). Therefore, the government's argument that Sanford's claims fail for lack of a cause of action is rejected.

tax credits of § 1401 through a permanent appropriation, it has never appropriated money to fund § 1402 payments, whether on a permanent or annual basis.

The determination of a statute's meaning begins (and often ends) with its language. Rosete v. Office of Pers. Mgmt., 48 F.3d 514, 517 (Fed. Cir. 1995); see also Star Athletica, L.L.C. v. Varsity Brands, Inc., 137 S. Ct. 1002, 1010 (2017) ("We thus begin and end our inquiry with the text, giving each word its ordinary, contemporary, common meaning." (quotation omitted)); McGee v. Peake, 511 F.3d 1352, 1356 (Fed. Cir. 2008). Where "Congress has expressed its intention by clear statutory language, that intention controls and must be given effect." Rosete, 48 F.3d at 517 (citing Chevron, U.S.A. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 843 n.9 (1984)). That is, where "statutory language is clear and unambiguous, the inquiry ends with the plain meaning." McGee, 511 F.3d at 1356 (quoting Myore v. Nicholson, 489 F.3d 1207, 1211 (Fed. Cir. 2007)).

In this case, the statutory language clearly and unambiguously imposes an obligation on the Secretary of HHS to make payments to health insurers that have implemented cost-sharing reductions on their covered plans as required by the ACA. It states that:

> An issuer of a qualified health plan making reductions under this subsection shall notify the Secretary of such reductions and <u>the Secretary shall make periodic and timely payments to the issuer equal to the value of the reductions</u>.

42 U.S.C. § 18071(c)(3)(A) (emphasis supplied).

Notwithstanding the plain language of this provision (and HHS's implementing regulations), the government argues that § 1402 does not give rise to a statutory payment obligation because Congress has never appropriated funds to meet any such obligation. It contends that while "Congress has the power to make particular payments an 'obligation' of the government without regard to appropriations, or to vest an agency with budget authority in advance of appropriations," "in the limited circumstances where Congress intends to do so, it does so explicitly." Mot. to Dismiss at 17–18, ECF No. 8. For example, the government notes, in the Medicare Part D statute, Congress coupled a direction that the Secretary "shall provide for payment" of certain subsidies to insurers with a statement that the directive "constitutes budget authority in advance of appropriations Acts and represents the obligation of the Secretary to provide for the payment of amounts provided under this section." Id. at 18 (quoting 42 U.S.C. § 1395w-115(a)). The government also argues that in previous cases where a payment obligation was found, Congress had explicitly characterized the payment as an "entitlement" in the statute. Id. at 21.

None of these arguments withstands scrutiny under controlling precedent, the most recent example of which is the court of appeals's decision in Moda Health Plan. In that case, the issue was whether § 1342 of the ACA imposed an obligation on the government to make payments to insurers under the ACA's risk corridors program. See 892 F.3d at 1314, 1320. The government argued in that case, as it does here, that notwithstanding § 1342's language (that the Secretary "shall pay" insurers), no payment obligation was created. Id. at 1321. It so argued because § 1342 "provided no budgetary authority to the Secretary of HHS and identified no source of

funds for any payment obligations beyond payments in," which were insufficient to fund the payments out in full. Id.

As the government concedes in its reply brief, "in Moda, the Federal Circuit concluded that the language in Section 1342 stating that the Secretary 'shall pay' certain amounts in accordance with a statutory formula initially created an obligation to make full risk-corridors payments without regard to appropriations or budget authority." Def.'s Reply at 5. Indeed, in Moda, the court of appeals found the language of § 1342 "unambiguously mandatory." 892 F.3d at 1320. Further, the court of appeals rejected an analogy drawn from the language in the Medicare Part D statute similar to the one the government draws in this case. See id. at 1322. The court of appeals found it "immaterial that Congress provided that the risk corridors program established by section 1342 would be 'based on the program' establishing risk corridors in Medicare Part D yet declined to provide 'budget authority in advance of appropriations acts,' as in the corresponding Medicare statute." Id. "Budget authority," it observed, "is not necessary to create an obligation of the government; it is a means by which an officer is afforded that authority." Id. In short, the court held, the obligation at issue was "created by the statute itself, not by the agency," and the government had provided "no authority for its contention that a statutory obligation cannot exist absent budget authority." Id. The court of appeals therefore "conclude[d] that the plain language of section 1342 created an obligation of the government to pay participants in the health benefit exchanges the full amount indicated by the statutory formula for payments out under the risk corridors program." Id.

In a footnote in its reply brief, the government asserts that it disagrees "with this aspect of Moda's reasoning" and purports to "preserve the issue for further review." Def.'s Reply at 5 n.2. But the court of appeals broke no new ground in Moda when it held that the "shall pay" language of § 1342 created a statutory payment obligation and that the lack of appropriated funds was irrelevant to whether such an obligation was enforceable in this court. As it explained, "it has long been the law that the government may incur a debt independent of an appropriation to satisfy that debt, at least in certain circumstances." Moda Health Plan, 892 F.3d at 1321. Thus, the court of appeals observed, its "predecessor court noted long ago that '[a]n appropriation per se merely imposes limitations upon the Government's own agents; it is a definite amount of money intrusted to them for distribution; but its insufficiency does not pay the Government's debts, nor cancel its obligations, nor defeat the rights of other parties.'" Id. (quoting Ferris v. United States, 27 Ct. Cl. 542, 546 (1892)); see also Slattery v. United States, 635 F.3d 1298, 1303, 1321 (Fed. Cir. 2011) (en banc) (failure to appropriate funds did not absolve the government of its statutory obligation to pay amounts owed); Greenlee Cty., 487 F.3d at 877 (Congress's failure to appropriate funds does not "defeat a Government obligation created by statute" (quotation omitted)); N.Y. Airways, Inc. v. United States, 369 F.2d 743, 748 (Ct. Cl. 1966) ("It has long been established that the mere failure of Congress to appropriate funds, without further words modifying or repealing, expressly or by clear implication, the substantive law, does not in and of itself defeat a Government obligation created by statute.").

To be sure, in Moda, the majority of the panel went on to address whether, notwithstanding the initial statutory obligation imposed by the ACA, Congress had capped the amount of payments the government was obligated to make under § 1324 through subsequent

8

specific appropriations riders. 892 F.3d at 1322–29.[6] The question before it, the court of appeals observed, was "whether [subsequent] riders on the CMS Program Management appropriations supplied the clear implication of Congress's intent to impose a new payment methodology for the time covered by the appropriations bills in question, as in [United States v. ]Mitchell, [109 U.S. 146 (1883)] or if Congress merely appropriated a less amount for the risk corridors program, as in [United States v. ]Langston[, 118 U.S. 389 (1886)]." Id. at 1323.

The court of appeals's juxtaposition of Mitchell and Langston is instructive. In Mitchell, "the Supreme Court held that a statute that had set the salaries of certain interpreters at a fixed sum 'in full of all emoluments whatsoever' had been impliedly amended, where Congress appropriated funds less than the fixed sum set by statute, with a separate sum set aside for additional compensation at the discretion of the Secretary of the Interior." Id. (quoting Mitchell, 109 U.S. at 149). In Langston, on the other hand, the Supreme Court held that "a bare failure to appropriate funds to meet a statutory obligation could not vitiate that obligation because it carried no implication of Congress's intent to amend or suspend the substantive law at issue." Id.

This case clearly falls into the same category as Langston, and is not at all like Mitchell. In this case, there was no relevant congressional action taken at all after the passage of the ACA. There have been no appropriations bills enacted that make reference to § 1402. All that exists is the payment obligation spelled out by the plain language of § 1402 and the "bare failure to appropriate funds" that the Supreme Court found insufficient to establish the congressional intent necessary to vitiate a statutory payment obligation in Langston. Id.; see also Butterbaugh v. Dep't of Justice, 336 F.3d 1332, 1342 (Fed. Cir. 2003) (observing that "congressional inaction is perhaps the weakest of all tools for ascertaining legislative intent").

Further, the Court finds unpersuasive the government's argument that "Congress made clear its intent not to fund CSR payments when it permanently appropriated funds for the only other statutory section appearing in the same subpart, while declining to do so for CSR payments." Def.'s Reply at 2 (emphasis in original). The most one can say about Congress's decision to permanently appropriate funds for the tax credits but not for CSR payments is that it reveals that Congress did not intend for CSR payments to be funded by permanent appropriations. Its failure to establish a permanent funding mechanism for the CSR payments does not, as the government would have it, give rise to the implausible inference that Congress intended "to consign CSRs 'to the fiscal limbo of an account due but not payable.'" Id. at 8 (quoting United States v. Will, 449 U.S. 200, 224 (1980)). To the contrary, the lack of a permanent funding mechanism suggests that when it enacted the ACA, Congress anticipated that the CSR payments it obligated the government to pay in § 1402 would ultimately be funded through the annual appropriations process. And, for the reasons set forth above, the Court cannot infer intent to vitiate the obligation imposed by § 1402 based solely on Congress's subsequent failure to make such appropriations.

---

[6] The plaintiffs in Moda have since petitioned for rehearing en banc as to that portion of the court of appeals's decision (as well as its rejection of their contract-based claims) and, at the court's request, the United States has responded to the petition. See Docket, Moda Health Plan, Inc. v. United States, No. 17-1994 (Fed. Cir.).

Finally, the government contends that "it is particularly implausible to conclude that Congress . . . intended to grant issuers a damages remedy" because issuers may be able to mitigate the lack of CSR payments by increasing the cost of their premiums. Id. at 10; see also California, 267 F. Supp. 3d at 1136 (observing that "[e]ven before the Administration announced its decision, 38 states accounted for the possible termination of CSR payments in setting their 2018 premium rates" and that more states began adopting premium increase strategies for 2018 after the announcement).[7] Of course, Sanford was unable to raise its premiums to make up for the shortfall in 2017, because by the time HHS issued its stop payment order, premiums for that year were set; in fact, the year was almost over. But in any event, even assuming that insurers could make up for the shortfall in CSR payments by raising their premiums, approval of premium rates is a matter for the states. There is no evidence in either the language of the ACA or its legislative history that Congress intended that the statutory obligation to make CSR payments should or would be subject to an offset based on an insurer's premium rates. The Court concludes, therefore, that premium rates have no bearing on whether § 1402 created a statutory obligation to pay insurers compensation for the cost-sharing reductions they implemented.

*   *   *   *   *   *   *

For the reasons set forth above, the government was statutorily obligated to provide Sanford with cost-sharing reduction payments for the remaining months of 2017. That obligation was not vitiated by Congress's failure to appropriate funds for that purpose. Accordingly, Sanford is entitled to judgment as to liability as a matter of law.

## CONCLUSION

For the reasons set forth above, the government's motion to dismiss is **DENIED** and Sanford's cross-motion for summary judgment as to liability is **GRANTED**. The clerk is directed to enter final judgment in favor of plaintiff Sanford Health Plan in the amount of $360,254. Costs are awarded to Plaintiff.

---

[7] Judge Chhabria's opinion in California v. Trump includes an interesting discussion of the effect that these premium increases would have on the cost to enrollees on the exchanges. 267 F. Supp. 3d at 1133–38. Paradoxically, the majority of the participants in the exchanges (and particularly lower income participants) would actually pay less for their insurance coverage because the increases in premiums would lead to an increase in the premium tax credits to which they are entitled. Id.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge
